IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2024

**LACY L. AUSTIN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2017-CR-575     William R. Goodman III, Judge**

_____

**No. M2023-01680-CCA-R3-PC**

_____

Petitioner, Lacy L. Austin, appeals from the Montgomery County Circuit Court's denial of his petition for post-conviction relief related to his convictions for two counts of possession of twenty-six grams or more of methamphetamine with the intent to sell or deliver within 1,000 feet of a school zone; possession of a firearm during the commission of a dangerous felony; possession of a firearm by a person convicted of a felony drug offense; possession of a firearm by a person convicted of a felony involving the use of force or violence; simple possession of marijuana; and possession of drug paraphernalia. Petitioner argues that the post-conviction court erred in denying relief based upon his claims that he received ineffective assistance of trial and appellate counsel. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Alexa M. Spata, Clarksville, Tennessee, for the appellant, Lacy L. Austin.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Robert J. Nash, District Attorney General; and Kayla M. McBride, Deputy District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.     Procedural history**

On direct appeal, this court summarized the suppression hearing testimony and trial evidence as follows:

On October 5, 2016, Montgomery County Sheriff's Deputy and 19th Judicial District Drug Task Force Deputy Daniel Gagnon conducted a traffic stop of [Petitioner] on Lafayette Road in Clarksville near Northwest High School. [Petitioner] was driving with a revoked license and had failed to stop completely before turning right at a red light. As a result of a search during the traffic stop, Deputy Gagnon found a quantity of methamphetamine concealed in a false-bottom can, a small amount of marijuana, and drug paraphernalia consistent with the resale of drugs; a handgun was also present in the car.

The May 2017 term of the Montgomery County Grand Jury charged [Petitioner] in Counts 1 and 2 with possession of twenty-six grams or more of methamphetamine with the intent to sell or deliver, respectively, within 1,000 feet of a school zone; in Count 3 [with] possession of a firearm during the commission of a dangerous felony; in Count 4 with possession of a firearm by a person convicted of a felony drug offense; in Count 5 with possession of a firearm by a person convicted of a felony involving the use of force or violence; in Count 6 with simple possession of marijuana; and in Count 7 with possession of drug paraphernalia. *See* Tenn. Code Ann. §§ 39-17-408, -17-415, -17-418, -17-425, - 17-434, -17-1307(b)(1)(A), (B), -17-1324(a). Thereafter, [Petitioner] filed a motion to suppress the evidence obtained during the search, alleging that Deputy Gagnon impermissibly prolonged and exceeded the scope of his initial stop by investigating [Petitioner]'s passengers[.]

### a. Suppression Hearing

At the October 10, 2017 suppression hearing, Deputy Gagnon testified that he was previously acquainted with [Petitioner] and that he was aware that [Petitioner] was a convicted felon. Describing the events surrounding the traffic stop, Deputy Gagnon stated that on October 5, 2016, he was driving an unmarked police cruiser on Highway 374 when he noticed [Petitioner] driving a car on the same road. Deputy Gagnon recalled that [Petitioner]'s driver's license had recently been revoked for unpaid criminal court costs, and he began to follow [Petitioner]. Deputy Gagnon called another deputy to verify the status of [Petitioner]'s license; upon receiving confirmation that it had been revoked, Deputy Gagnon continued to follow [Petitioner] and "waited for him to commit a traffic infraction." Deputy Gagnon explained it was simpler, in his opinion, to justify a traffic stop based upon a traffic offense rather than having to explain the basis of his knowledge that [Petitioner]'s license had been revoked.

Deputy Gagnon testified that [Petitioner] subsequently turned right at the intersection of Highway 374 and Lafayette Road; although the traffic signal was red, [Petitioner] did not come to a complete stop before turning. Deputy Gagnon was directly behind [Petitioner]'s car, and he subsequently activated his blue lights after turning right onto Lafayette Road. [Petitioner] pulled into a residential driveway on the 800 block of Lafayette Road. Deputy Gagnon agreed that based upon his previous experience with [Petitioner], drug possession was "a thought in the back of [his] mind," but he stated that he "really" wanted to stop [Petitioner] for driving with a revoked license.

Deputy Gagnon testified that a male passenger sat in the passenger-side back seat, and a female passenger sat in the front passenger seat. Deputy Gagnon stated that the male passenger was moving around more than usual; as a result, Deputy Gagnon called for backup. Deputy Gagnon walked to the car and asked [Petitioner] for his license and insurance. Deputy Gagnon told [Petitioner] that he failed to stop at the red light. When asked whether he was aware that his license had been revoked, [Petitioner] responded negatively.

Deputy Gagnon asked the passengers for their names; the female passenger identified herself as Heather Brown, and the male passenger identified himself as Jason McCarty. Neither passenger had an identification card, and Deputy Gagnon asked both of them to write down their names, dates of birth, and social security numbers in order to verify their identities and whether "they had valid licenses[.]" Deputy Gagnon noted that Ms. Brown hesitated for several seconds before writing down her information, which "raised a red flag[.]" After Mr. McCarty wrote down his information, Deputy Gagnon asked [Petitioner] to exit the car.

Deputy Gagnon testified that [Petitioner] gave consent for a pat-down search and for Deputy Gagnon to search his pockets; although [Petitioner] had no weapons, Deputy Gagnon found a "large sum" of cash. [Petitioner] told Deputy Gagnon that he was driving from Dover, Tennessee, to a car dealership in Clarksville. At this point, a Clarksville police officer arrived, and Deputy Gagnon asked him to stay with [Petitioner]. Deputy Gagnon returned to the front passenger window to speak to Ms. Brown because he had a "suspicion" that she had given him false information due to her previous hesitation. Deputy Gagnon noted that Mr. McCarty again "began moving around furtively" by moving side to side and placing his hands out of Deputy Gagnon's view. Deputy Gagnon asked Mr. McCarty to place his

hands on the back of the front passenger headrest and inquired with both passengers about their destination. Ms. Brown stated that they were going to her father's house, and Mr. McCarty simultaneously said that they were going to a friend's house. Based upon their inconsistent answers, Deputy Gagnon asked Ms. Brown to exit the car.

When Ms. Brown stood up, Deputy Gagnon saw that she had been sitting on a digital scale with "a crystalline substance on it" and a plastic bag containing several smaller bags. Deputy Gagnon searched Ms. Brown and asked Mr. McCarty to exit the car. During a patdown search for weapons, Deputy Gagnon felt an object in Mr. McCarty's "groin region" and shook his pant leg, upon which a glass methamphetamine pipe fell out and broke on the ground. Deputy Gagnon placed Mr. McCarty and Ms. Brown under arrest.

Deputy Gagnon then returned to [Petitioner] and asked if the car contained any narcotics or firearms; [Petitioner] responded that there was a handgun in the driver's side floorboard. When told that he was not permitted to possess a firearm, [Petitioner] stated that he understood and that the gun belonged to his sister. Deputy Gagnon arrested [Petitioner]; after a more thorough search of the car, Deputy Gagnon found a false-bottom can containing two plastic bags of methamphetamine in the back seat behind the center console.

Deputy Gagnon estimated that eight or nine minutes passed between the time he stopped [Petitioner] and [Petitioner]'s arrest. The police dispatch log reflected that Deputy Gagnon reported at 4:38 p.m. that he was going to initiate the traffic stop and that he reported at 4:50 p.m. that he had arrested [Petitioner] and Mr. McCarty.

Deputy Gagnon testified that after he informed the trio of their rights, Ms. Brown and Mr. McCarty spoke to him, and [Petitioner] declined to make a statement. Ms. Brown and Mr. McCarty both admitted to knowing that a "little bit" of methamphetamine was in the car. Ms. Brown stated that the methamphetamine belonged to [Petitioner], and Mr. McCarty said that he did not realize that the car contained such a large quantity of methamphetamine. When Deputy Gagnon brought [Petitioner] to "the Magistrate's window," [Petitioner] "blurt[ed]" out that he could help the police "get one of the biggest dealers in Clarksville," but that if his photograph appeared in the booking report, "they" would see it, after which [Petitioner] could not "do anything for" the police.

- 4 -

On cross-examination, Deputy Gagnon testified that at the time of the October 2016 traffic stop, he knew that [Petitioner] was serving an eight-year community corrections sentence in connection with a previous case involving prescription pills. Deputy Gagnon noted that he kept himself apprised of the outcome of cases in which he was involved, including whether the defendants had been placed on probation. Deputy Gagnon also routinely "check[ed] driver's licenses" to determine where defendants were living "and things of that nature."

Deputy Gagnon testified that although he did not decide to arrest [Petitioner] before initiating the traffic stop, he was "pretty sure" he would arrest [Petitioner] because [Petitioner] was serving an alternative sentence; as a result, [Petitioner] "was more than likely going to jail" for driving with a revoked license. When asked how long he waited after turning onto Lafayette Road before activating his blue lights, Deputy Gagnon stated that after turning, he called police dispatch to inform them of his location and that he was making a stop. He estimated that on Lafayette Road, the distance between the Highway 374 intersection and the next major intersection at North Liberty Church Road was about one-quarter of one mile.

Deputy Gagnon testified that he routinely asked drivers with revoked licenses to exit their cars because they could not legally continue to drive. He agreed that [Petitioner] did not appear to be armed and that he was not making "suspicious movements." Deputy Gagnon acknowledged that none of his questions to [Petitioner] or the passengers related to running the red light and that after the initial discussion of [Petitioner]'s driver's license, he did not mention it.

Deputy Gagnon testified that all three occupants of the car were breathing rapidly when he asked [Petitioner] for his license. Deputy Gagnon denied that he asked Ms. Brown and Mr. McCarty to exit the car in the hope of seeing "more things, maybe contraband and things like that[.]" He acknowledged that his primary job was related to narcotics investigation; he denied, however, that he was looking for drugs after he initially spoke to [Petitioner]. Deputy Gagnon stated that he investigated Ms. Brown because he "believed she wasn't telling [him] the truth [about] who she was," which was a crime. He agreed that he told Ms. Brown that he would not charge her with giving a false identity.

Deputy Gagnon testified that he searched Ms. Brown's "immediate area" in the car and found a bag containing about six grams of marijuana in

a grocery bag "wedged in between the passenger seat and center console." Deputy Gagnon stated that he found the false-bottom can underneath the front passenger seat and partially protruding into the passenger back seat floorboard. He agreed that the can was within Mr. McCarty's reach and in the same area into which Mr. McCarty had been bending. Deputy Gagnon further agreed that the items in Ms. Brown's vicinity were under her control. Deputy Gagnon stated that he did not field test the residue on the scale.

[Petitioner] argued that Deputy Gagnon impermissibly started "another investigation" that "abandoned" the original purpose of the traffic stop when he "pull[ed] folks out of the car." [Petitioner] argued that nervous behavior and a previous drug-related criminal history were not alone sufficient to provide reasonable suspicion of criminal activity such that a search of a vehicle was permissible, citing *State v. [Simmons]*, No. M2008-00107-CCA-R3-CD, 2009 WL 2391403, at *6 (Tenn. Crim. App. Aug. 5, 2009). [Petitioner] contended that the traffic stop was impermissibly prolonged and became unreasonable when Deputy Gagnon "start[ed] going through people's pockets and seizing their money." [Petitioner] argued that his liberty was "substantially compromised" and that Deputy Gagnon did not have a legitimate reason to search the vehicle incident to an arrest. [Petitioner] argued that Deputy Gagnon's reason for stopping [Petitioner] was pretextual in light of his true intent to search [Petitioner]'s car for drugs.

The State responded that Deputy Gagnon had probable cause to arrest [Petitioner] at the time he verified that [Petitioner] was driving with a revoked license. The State averred that it was reasonable for Deputy Gagnon to do "a little bit of additional investigation" before deciding whether to arrest [Petitioner]. The State characterized Deputy Gagnon's actions as "designed not to be oppressive towards [Petitioner] or the other individuals there."

The trial court noted that "so long as the stop ha[d] legitimate underpinnings . . . it [did not] make any difference that it [was] a pretextual stop[.]" The court noted that a driver should expect to spend a short period of time answering questions and waiting while an officer checks his license and registration and that this general procedure was followed in [Petitioner]'s case. The court found that it was reasonable for Deputy Gagnon to have asked Ms. Brown and Mr. McCarty to exit the car. The court further found that probable cause for [Petitioner]'s arrest arose from his possessing a gun in the car as a convicted felon. The court denied the motion to suppress.

- 6 -

*b. Trial*

Before the trial began, the trial court bifurcated the proceedings by agreement of the parties. Counts 4 and 5 relative to possession of a firearm by a convicted felon were considered after the return of the verdict relative to Counts 1-3 and 6-7. Deputy Gagnon testified consistently with his suppression hearing testimony, except he identified Ms. Brown as "Christina Brown" and stated that Mr. McCarty produced identification upon request. Deputy Gagnon added that when he encountered [Petitioner], Ms. Brown, and Mr. McCarty, they were all breathing rapidly and looked extremely nervous; he commented that although some level of nervousness was typical during a police encounter, normal people did not exhibit "signs of extreme nervousness" such as "carotid arteries . . . pulsating out of their neck[s]" or shaking hands and arms. Deputy Gagnon noted that [Petitioner] had about $1,471 in cash inside his pockets.

Deputy Gagnon testified that when Ms. Brown exited the car, he saw a grocery bag containing a green plant material resembling marijuana, as well as the digital scale and plastic bags. Deputy Gagnon identified photographs of items found in [Petitioner]'s car, including the drug-related items and two cell phones. He stated that in his experience, drug sellers commonly carried digital scales and drug users did not. Deputy Gagnon said that one of the cell phones came from Ms. Brown's person or her purse, and the other cell phone was found in the car's center console. Deputy Gagnon obtained search warrants for both cell phones.

At this point, [Petitioner] objected to the admission of the cell phone from the center console as an exhibit, arguing that no foundation had been laid to establish that the phone belonged to him. Upon further examination by the State, Deputy Gagnon testified that he determined that the phone belonged to [Petitioner] by reading the text messages contained therein. He explained that the phone contained text messages sent from a contact labeled with Mr. McCarty's name, which excluded Mr. McCarty as the owner. Similarly, some of the incoming text messages addressed the intended recipient using gendered language such as "dude, bro, [and] man," which excluded Ms. Brown as the owner. Deputy Gagnon noted that the cell phone recovered from Ms. Brown contained messages referencing the phone's owner as "Christina," indicating that it belonged to her. Deputy Gagnon did not recall whether any of the text messages on [Petitioner]'s cell phone referred to him by name.

[Petitioner] renewed his objection, and the trial court found that because Deputy Gagnon testified that he saw the cell phone in the car, it would admit the phone as an exhibit. The court noted that it would "remain then as to whose phone it [was.]"

Deputy Gagnon testified that in Ms. Brown's seat, he found two large plastic bags containing eighteen smaller bags each, for a total of thirty-six small plastic bags. He noted that in his experience, narcotics were packaged for sale in similar bags. Deputy Gagnon stated that he recovered the handgun, which was loaded, from the driver's seat floorboard; he also found unfired bullets loose in the car, as well as in a plastic ammunition holder.

Deputy Gagnon testified that in addition to the methamphetamine pipe from Mr. McCarty's pants, he found a methamphetamine pipe in Ms. Brown's purse. Deputy Gagnon agreed that unlike Ms. Brown and Mr. McCarty, [Petitioner] possessed no drug paraphernalia consistent with his using methamphetamine. He stated that the leafy substance from the passenger seat field tested positive for marijuana and that the substance from the false-bottom can field tested positive for methamphetamine. He noted that the methamphetamine from the can was packaged in two separate plastic bags, which weighed about twenty-nine and twenty-seven grams, respectively.

Deputy Gagnon testified that methamphetamine was typically sold in several standard quantities, including one gram, an "eight-ball," which was three and one-half grams, a quarter ounce or "quarter," and a "half ounce." Deputy Gagnon noted that a "zip" was a quantitative term used to refer to one ounce of any of several types of illegal drugs, including methamphetamine, marijuana, cocaine, or heroin. He said that although $1,100 per ounce was "kind of expensive" for methamphetamine, it was still within a normal price range. Deputy Gagnon stated that in his experience, if fifty-six grams of methamphetamine were sold in one-gram increments, it was worth about $5,600.

Deputy Gagnon identified several photographs of text messages recovered from the cell phone found in the center console. [Petitioner] objected and argued that the State had still not established that the phone belonged to [Petitioner]. The trial court found that the identity of the phone's owner was a jury question, which could be established by circumstantial evidence, and it overruled the objection.

- 8 -

Photographs of text messages were received as exhibits and reflected the following:

| To | From | Date/Time | Message |
|---|---|---|---|
| | "Jason Mcarty" | 10/04/2016 10:26 p.m. | "Il buy 2 zips for 2000 a friend wants it yes or no nd to knw so I cn tel hm make happen bro" |
| | Jason Mcarty | 10/04/2016 11:40 p.m. | "I justtexted them told them ur right 50 more I only utrying help" |
| | Jason Mcarty | 10/05/2016 2:35 a.m. | "I can mv more imorning but get quarter knw if you want to i can" |
| | Jason Mcarty | 10/05/2016 2:37 a.m. | "K i nd a hf how much other in morning" |
| Jason Mcarty | | 10/05/2016 2:38 a.m. | "650 4 a 1/2" |
| | "Jimbob Thornton" | 10/05/2016 7:45 a.m. | "Yo zip" |
| | Jimbob Thornton | 10/05/2016 7:48 a.m. | "Need a w zip for eleven hun im serious" |
| Jimbob Thornton | | 10/05/2016 8:46 a.m. | "K hv it" |
| Jimbob Thornton | | 10/05/2016 8:47 a.m. | "1200" |
| Jason Mcarty | | 10/05/2016 2:01 p.m. | "Twenty two for two" |
| | Jason Mcarty | 10/05/2016 2:24 p.m. | "22 hndrd for 2 zips that what u sayin sor bro lot onmind gues that b---ch f---ing revoked my bond gxes bulsht trying set me up get me busted if gother get stuf hav me arrested got orrder protection on me bvlsht hows that work mis covrtdate reschedul it caus went rehab thought that was ptting my self in |

| | | | state custity then knw clinme f--kf bro il try m that holdon let me try dov they nd knw" |
|---|---|---|---|
| "Wayne Powel St" | | 10/05/2016 2:57 p.m | "I need another n an hr" |
| | Jason Mcarty | 10/05/2016 3:45 p.m. | "Dude with nic sold quarter for 400 for u" |
| Wayne Powel St | | 10/05/2016 4:13 p.m. | "Need four now" |
| Wayne Powel St | | 10/05/2016 4:33 p.m. | "I need four" |
| | "Lola" | 10/05/2016 Time not shown | "I'm wrking no time for silly s--t ok watch ur self she has robbed ppl b for I'd hate for her to rob u. And hurt u I'm for real lynn" |

[Petitioner] objected to the text messages sent from Jimbob Thornton as inadmissible hearsay; the State responded that the messages were "indicative of drug transactions that [were] ongoing" and that they were found on a cell phone in [Petitioner]'s "immediate vicinity." The trial court found that the messages were admissible "[f]or that limited purpose" and overruled the objection. The court noted for the record [Petitioner]'s hearsay-based objection to the remainder of the incoming messages.

Deputy Gagnon testified that the message to Mr. McCarty about "650 for a half" was reciting the price of one half-ounce of methamphetamine; he noted that the price was too high to have referred to marijuana. Deputy Gagnon said that the message from Mr. McCarty about a man named Nick referred to selling one quarter-ounce of methamphetamine for $400, which was a standard price.

Deputy Gagnon testified that the traffic stop occurred about 349 feet from Northwest High School. He stated that when [Petitioner] arrived at the police station, he told Deputy Gagnon that if he did not "book [Petitioner] in" the system, [Petitioner] could help Deputy Gagnon "make an extremely large federal case." [Petitioner] also told Deputy Gagnon that if [Petitioner]'s photograph appeared in the booking log, the "big time . . . dealers" would not "mess with" [Petitioner] anymore.

On cross-examination, Deputy Gagnon acknowledged that he could have initiated the traffic stop upon seeing [Petitioner] or immediately upon [Petitioner]'s rolling through the red light. Deputy Gagnon noted that he called dispatch to notify them of the stop before he activated his blue lights around [Glennon] Drive. He acknowledged that his police report stated that he activated his lights at the intersection of Lafayette Road and North Liberty Church Road. When asked why he waited to pull over [Petitioner] until they had almost reached the school, Deputy Gagnon repeated that he anticipated having to argue a suppression issue in court and that he "waited for a traffic infraction" to avoid having to explain the basis for his knowledge of [Petitioner]'s prior license revocation. Relative to the location of the traffic stop, Deputy Gagnon explained that he continued driving as he turned onto Lafayette Road, called dispatch, received a response, and activated his blue lights.

Deputy Gagnon testified that he had "no idea" whether [Petitioner] intended to sell the methamphetamine inside the school zone, and he explained for the jury the circumstances in which the school zone enhancement applied to drug offenses. Deputy Gagnon agreed that [Petitioner] was compliant during the traffic stop. Deputy Gagnon stated that Ms. Brown gave him a false name because she had an outstanding arrest warrant. He said that when he opened the false-bottom can, Ms. Brown began to cry and told Deputy Gagnon that she knew the can contained methamphetamine and that her fingerprints would be on the can. Deputy Gagnon did not know whether the can was tested for fingerprints. Deputy Gagnon agreed that the car belonged to [Petitioner] and that no other drugs were found aside from the marijuana and the methamphetamine in the can. Deputy Gagnon acknowledged that he was not "100 percent" certain that the cell phone from the center console belonged to [Petitioner]; however, he stated that in his "professional and personal opinion," he believed the phone was [Petitioner]'s. Deputy Gagnon further acknowledged that he found evidence of prescription pill sales on Ms. Brown's cell phone and that it was common for a drug dealer to possess more than one cell phone.

Tennessee Bureau of Investigation forensic chemist Rebecca Hernandez, an expert in drug identification, testified that she analyzed the leafy substance and one large bag of white material from [Petitioner]'s car, which she identified as 5.29 grams of marijuana and 27.90 grams of methamphetamine, respectively. Agent Hernandez noted that she did not test the second bag of suspected methamphetamine because the weight of the first bag of methamphetamine exceeded 26 grams, which was relevant to the

felony class charged, but the combined weight of both bags did not come close to exceeding 300 grams, the next weight-related felony class threshold.

Jason McCarty testified that he had known [Petitioner] for fifteen years and that he pled guilty to possession of methamphetamine related to the October 5, 2016 traffic stop. Mr. McCarty denied owning the methamphetamine and the gun in [Petitioner]'s car, and he stated that he did not know to whom either item belonged. When asked about the incoming text messages on [Petitioner]'s cell phone that were attributed to him, Mr. McCarty said that he believed another person sent the messages from his cell phone. He explained that after he was incarcerated in connection with a previous criminal case, his cell phone "was being used by somebody else" after being "stolen or something." Mr. McCarty said that he subsequently went to drug rehabilitation and that within a day or two of his release, he "got in the car with [Petitioner]" and they "got in trouble." He claimed that his cell phone was "gone" and that he did not have a cell phone in [Petitioner]'s car. Mr. McCarty noted that he had been "having a rough time."

On cross-examination, Mr. McCarty testified that during the traffic stop, he was nervous, breathing heavily, and moving around in an attempt to hide the methamphetamine pipe and a marijuana cigarette. He noted that he was a drug user as opposed to "a big time man." Mr. McCarty affirmed that he had recently smoked methamphetamine at the time of the traffic stop, and he said that on that day, he anticipated that the group was "going to smoke or do something like that." Mr. McCarty stated that he "probably" would not have gotten into [Petitioner]'s car if he knew it contained "a bunch [of] drugs[.]" Mr. McCarty averred both that he lacked any knowledge of the presence of methamphetamine in the car and also that he "thought maybe [they] had, like, a gram or something[.]" When asked to clarify whether he knew methamphetamine was in the car, Mr. McCarty said,

> I mean, not really. I mean . . . nobody just whipped out meth. But, I mean, I figured that's what we would do. We have smoked meth together.
>
> . . . .
>
> . . . I figured we had a little dope on us. I had a meth pipe. I might have had a little bit on me that I would put in the pipe. I mean, that's all I had was a pipe and a joint on me, so I really didn't have any meth, at the time.

Mr. McCarty maintained that he did not know to whom the methamphetamine in the can belonged. He stated that he pled guilty in order to avoid being in jail for "long, long, long periods of time and still get charged with it[.]" He stated that by pleading guilty, he admitted only that he was "in the wrong place at the wrong time[.]" He noted that he had been in jail for 135 days at the time he entered his guilty plea and that he had also "just served two years in Dover" for a violation of probation. Mr. McCarty agreed that pursuant to his plea agreement, he received eight years' probation in this case; he further agreed that if he did not testify against [Petitioner], his probation could be revoked.

Relative to his cell phone, Mr. McCarty testified that he had been incarcerated for seven months prior to the traffic stop and that during his confinement, he heard that his phone was being used by other people. He hypothesized that his cell phone was taken from a house in which he lived before he went to prison. Mr. McCarty stated that on the day of the traffic stop, [Petitioner] was going to help him buy tires for Mr. McCarty's sister-in-law and that they also planned to go to a hotel and "hang out or something" with "that girl." Mr. McCarty thought that he told Deputy Gagnon about the plan to buy tires.

Mr. McCarty testified that although the stipulated facts underlying his plea included that the gun in the car belonged to [Petitioner], he refused to "sit here and say that it was his gun or not[.]" Mr. McCarty affirmed that the gun was in [Petitioner]'s car under the driver's seat. However, Mr. McCarty stated that he did not initially know a gun was in the car and that [Petitioner] "just didn't willingly show" Mr. McCarty a gun. Mr. McCarty denied having fired the gun on a previous occasion and almost shooting himself.

Mr. McCarty averred that his testimony was truthful and that he was "a man" who would "take [his] charges" and admit the gun was his if that were the case. Mr. McCarty swore "to God, on Jesus' mother" that the gun and methamphetamine were not his.

Christina Brown testified that at the time of the trial, she was incarcerated for violating a previous probationary sentence, as well as for unspecified charges related to the October 5, 2016 traffic stop. Relative to the charges arising from the traffic stop, Ms. Brown pled guilty to possession of drug paraphernalia and "all the other charges" were dismissed contingent on her trial testimony against [Petitioner]. Ms. Brown acknowledged that she had prior convictions for aggravated burglary, theft of property, and

- 13 -

shoplifting. She stated that on October 5, 2016, [Petitioner] picked her up from her father's house; when they stopped at a store, Ms. Brown saw [Petitioner] remove a gun from under a seat and place it in his pants. Ms. Brown said that they later picked up Mr. McCarty at his home. Ms. Brown stated that she owned a Verizon "smartphone" and that [Petitioner] had a "flip-phone." She identified both cell phones as the ones introduced as exhibits.

Ms. Brown testified that at some point, [Petitioner] asked her to find the false-bottom can, which had rolled around in the back seat. Ms. Brown eventually located it underneath the front passenger seat, and she agreed that her fingerprints would have been present on the can. She stated that she saw a digital scale in the center console. Ms. Brown acknowledged that when she exited the car during the traffic stop, she was sitting on empty plastic bags and a grocery bag containing marijuana.

On cross-examination, Ms. Brown admitted that she lied to Deputy Gagnon by giving a false name because she had an active arrest warrant on file. She acknowledged telling Deputy Gagnon that they were traveling to her father's house. She denied owning the plastic bags, digital scale, and marijuana. Ms. Brown stated that the car contained "a lot of stuff" and that she did not pay attention to the items on which she sat. When asked whether she had any idea that she was sitting on drugs, Ms. Brown stated that she "might have been under the influence" at the time. Ms. Brown affirmed that the methamphetamine pipe in her purse was hers and that she had recently used it.

Ms. Brown testified that when Deputy Gagnon opened the false-bottom can and removed the bags of methamphetamine, she began to cry because she was "freaking out" and "was like, oh, my God." She denied knowing that methamphetamine was inside the can or in the car; however, she acknowledged telling Deputy Gagnon that she knew or assumed that methamphetamine was "probably" in the car. Ms. Brown admitted her methamphetamine use to Deputy Gagnon, and she agreed that a search of her cell phone revealed evidence of drug sales.

Ms. Brown acknowledged that after she testified against [Petitioner], any charges related to her incriminating statements and the drug selling activity documented on her cell phone would be dismissed pursuant to her plea agreement. Ms. Brown agreed that she was released on a one-year probationary sentence after entering her plea and that she was motivated to

- 14 -

accept the plea offer in order to obtain her "freedom." Ms. Brown stated that after two months on probation, her probation was revoked for leaving town to attend drug rehabilitation without notifying her probation officer and for failing a drug screen and testing positive for methamphetamine. Ms. Brown acknowledged that in March 2018, she incurred additional criminal charges and pled guilty to theft.

Upon this evidence, [Petitioner] was convicted as charged in Counts 1 through 5. The State then entered as exhibits certified copies of judgments related to [Petitioner]'s prior convictions. On December 10, 1996, [Petitioner] pled guilty in Montgomery County Criminal Court case number 36938 to possession of marijuana with the intent to resell. On February 27, 1989, [Petitioner] pled guilty in Montgomery County Criminal Court case number 25636 to aggravated assault. Upon this additional evidence, [Petitioner] was convicted as charged in Counts 6 and 7.

. . . .

After an August 16, 2018 sentencing hearing, the trial court merged the convictions in Counts 1 and 2 and Counts 6 and 7, respectively, and imposed an effective forty-two-year sentence.

*State v. Austin*, No. M2018-00591-CCA-R3-CD, 2020 WL 6277557, at *1-9 (Tenn. Crim. App. Oct. 27, 2020), *no perm app. filed*.

In the direct appeal, Petitioner argued that the trial court erred by denying the motion to suppress because Deputy Gagnon chose not to initiate the traffic stop until Petitioner rolled through a red light and exceeded the scope of the traffic stop by questioning Ms. Brown and Mr. McCarty and removing Ms. Brown from the car. *Id.* at *10. This court concluded relative to the pre-stop investigation that the issue was waived because the appellate record did not contain Petitioner's motion to suppress or the trial court's written order denying the motion; the suppression hearing transcript only included argument about the propriety of Deputy Gagnon's questioning the passengers; the motion for new trial did not specify the grounds upon which the evidence should have been suppressed; the motion for new trial hearing transcript was not included in the appellate record; and the trial court's order denying the motion for new trial did not include findings of fact or conclusions of law. *Id.* at *11. This court noted that it was "unclear whether [Petitioner] raised the pre-stop delay issue at any point prior to the instant appeal" and that Petitioner bore the burden of preparing an adequate record to facilitate this court's review. *Id.*; *see* Tenn. R. App. P. 36(a), 24(b); *see also [Baxter] v. State*, No. W2019-00590-CCA-R3-CD, 2020 WL 41926,

- 15 -

at \*2 (Tenn. Crim. App. Jan. 3, 2020) (citing *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993)).

Relative to Deputy Gagnon's asking Ms. Brown and Mr. McCarty for their identification, this court concluded that the trial court properly found it to be constitutionally permissible based upon Mr. McCarty's furtive movements and physical indications of extreme nervousness from all three of the car's occupants. *Id.* at \*12. Similarly, this court affirmed the trial court's finding that Deputy Gagnon was permitted to ask Ms. Brown to exit the vehicle, noting that Ms. Brown had hesitated when asked to write down her personal information, that Mr. McCarty had continued to move around such that Deputy Gagnon had to ask him to place his hands on the passenger seat in front of him, and that Ms. Brown and Mr. McCarty gave inconsistent answers regarding their destination that day. *Id.*

This court further concluded that the evidence was sufficient to establish that Petitioner constructively possessed the methamphetamine. *Id.* at \*13-14. Petitioner's remaining sufficiency arguments related to Ms. Brown and Mr. McCarty's credibility given their intoxication on the day of the traffic stop and their respective plea agreements with the State. *Id.* at \*13. This court noted that the jury "had ample evidence upon which to judge their credibility," including thorough cross-examination by trial counsel and argument from trial counsel in closing regarding Ms. Brown's potential intoxication. *Id.* at \*14.

Petitioner's final issues on appeal were evidentiary challenges to the text messages from the cell phone in the center console. *Id.* He argued that an inadequate foundation was laid to connect the cell phone and text messages to him or that they referred to drug transactions; (2) the risk of unfair prejudice substantially outweighed the probative value of the text message from Mr. McCarty disparaging an ex-girlfriend and using profanity, as well as the message from "Lola" warning Petitioner about an unknown person; and (3) the incoming text messages were inadmissible hearsay. *Id.*

This court noted that Petitioner's pretrial motion in limine was not included in the record but that the hearing transcript contained adequate information upon which to review the issue. *Id.* at n.12. Relative to the text messages' foundation, this court concluded that Petitioner had waived plenary review because his appellate brief contained no citation to legal authority or a standard of review. *Id.* at \*15; *see* Tenn. R. Ct. Crim. App. 10(b). However, this court reviewed the issue for plain error and determined that Deputy Gagnon properly authenticated the cell phone and text messages. *Id.* at \*16. This court further concluded, relative to both the text messages as a whole and specific messages raised by Petitioner, that the trial court acted within its discretion and that the probative value of the messages was not significantly outweighed by the risk of unfair prejudice. *Id.* at \*15-16.

- 16 -

This court stated that Petitioner had not established that a clear and unequivocal rule of law was breached and that "consideration of these issues [was] also not necessary to do substantial justice; given that the bulk of the text messages were properly authenticated, any prejudicial effect of the specific messages identified by [Petitioner] would have been minimal and harmless." *Id.* at *17.

However, this court concluded that the trial court abused its discretion by admitting the incoming text messages, noting that the State's stated purpose in introducing the messages—that messages documenting an ongoing series of drug transactions were found in Petitioner's car—relied upon the messages' truth. *Id.* This court found that the error was harmless in light of the overwhelming evidence of Petitioner's intent and that a rational juror "could have concluded without reading the incoming text messages that [Petitioner] intended to sell methamphetamine." *Id.* This court noted that the trial evidence showed that a digital scale and a quantity of small plastic bags was in Petitioner's car; that Petitioner made inculpatory statements in his outgoing text messages; that Petitioner was carrying a large amount of cash on his person; and that Petitioner told Deputy Gagnon "that he could help the police prosecute important methamphetamine dealers if he were not booked into jail." *Id.* This court affirmed Petitioner's judgments of conviction. *Id.* at 1.

On October 26, 2021, Petitioner filed a timely pro se petition for post-conviction relief, which post-conviction counsel amended. In relevant part, Petitioner alleged that trial counsel provided ineffective assistance by (1) failing to provide Petitioner with and review the preliminary hearing transcript; (2) prepare, investigate, communicate factual or legal aspects of the case, interview and call witnesses, and file and litigate "all proper motions"; (3) develop a defense strategy, investigate police and witness statements, request and investigate the discovery materials, and explain the evidence to Petitioner in a timely manner; and (4) raise objections at the suppression hearing and at trial, which resulted in waiver on appeal. Petitioner also alleged that appellate counsel failed to "raise pertinent issues of law" on appeal.

At the post-conviction hearing,[1] Petitioner testified that he had different attorneys before trial, at trial, at the sentencing and motion for new trial hearings, and on appeal.[2] Upon examining the affidavit of complaint for his arrest warrant, Petitioner averred that its contents were inconsistent with Deputy Gagnon's trial testimony and that he brought the inconsistencies to trial counsel's attention. According to Petitioner, "there [was] nothing

---

[1] The post-conviction petition, as amended, included several grounds of ineffective assistance of counsel that were addressed at the post-conviction hearing but have not been raised on appeal. Our summary of the post-conviction proceedings is tailored accordingly.

[2] For clarity, we will refer to the respective attorneys as "pretrial counsel," "trial counsel," and "appellate counsel." Sentencing counsel was not discussed further at the post-conviction hearing.

in the affidavit of complaint about driving on a revoked or suspended license or seeing marijuana in plain sight," but trial counsel did not cross-examine Deputy Gagnon about "anything to do with that complaint[.]" When asked whether further cross-examination might have changed the outcome of the trial, Petitioner stated, "I think it would, yes. I think it would have helped. Because it would have proved that . . . driving on a revoked license was not the reason for the stop."

Petitioner testified that he was given a report of investigation ("the investigation report") and the discovery materials and that he reviewed them prior to trial. Petitioner asserted that the discovery materials contained many inconsistencies and that he discussed "many things" with trial counsel, although he did not recall anything specific. Petitioner stated that he discussed with trial counsel having invoked his right to an attorney but that "[t]here was nothing ever brought up in any of the trial about [Petitioner] discussing invoking [his] right to any attorney ever at any time." Petitioner stated that, to his knowledge, he did not request that trial counsel file a motion related to his having invoked the right to counsel, and counsel did not file any such motion. He opined that a motion should have been filed. When asked to elaborate, Petitioner stated,

> Because the issues that were said at trial, which I never said to begin with. I never admitted there was a gun in my car, and I never told [Deputy] Gagnon at [the] magistrate window that I wanted to make a deal with him and give him a [f]ederal drug case. That was never said. But even if it was said, by me invoking my rights to a trial, it should not have been used against me.

Petitioner said that he discussed with pretrial counsel that he "wanted the issues raised," although he did not know until the post-conviction hearing that he could have filed a motion related to his statements to police. Petitioner did not know if trial counsel ever spoke to the other law enforcement officers involved in the case; he noted that he "never got the [investigation report] from the other officers that [he] requested." Petitioner did not know if other officers were subpoenaed to court, only that they did not testify.

Petitioner testified that trial counsel cross-examined Deputy Gagnon on "very few" of the inconsistencies between his trial testimony and the discovery materials. He opined that, if trial counsel had cross-examined Deputy Gagnon using the investigation report, the result at trial would have been different.

The investigation report was received as an exhibit. The report stated that it had been prepared on October 5, 2016; however, it contained the following in a summary of the facts of the case:

26. [Petitioner]'s cellular phones were seized and search warrants are going to be written for these.

27. On October 7, 2016, I wrote two separate search warrants for two cellular phones that [w]ere contained in [Petitioner]'s vehicle. Both of the search warrants [w]ere written under [Petitioner]'s name and the search warrants [w]ere signed by a Judge of the General Sessions Courts in Montgomery County, TN.

28. On the LG Flip phone, belonging to [Petitioner] the[re] [w]ere several messages with text messages that were and are indicative of narcotics resale and purchases. [Petitioner] is seen communicating with [Mr. McCarty] in several text messages where [Mr. McCarty] is talking about selling ounces, quarter ounces and grams for [Petitioner]. [Petitioner] replied back to [Mr. McCarty] on these occasions.

Petitioner identified a property inventory form from his jail booking, which was received as an exhibit. He noted that the list included "1 TN DL," which referred to his driver's license. He stated that Deputy Gagnon gave three reasons for stopping him—driving with a revoked license, having a cover over his license plate, and failing to stop at a red light. Petitioner noted that he was not cited or arrested for "any of those." He stated that the inventory form did not show that his license was revoked and that it was "put in [his] property." Petitioner denied that any motion was filed "related to the fact that [his] license was given back to [him]." Petitioner stated that he discussed with trial counsel that his license was not taken away and that, if trial counsel had brought it up at trial, it would have proven that he "was not stopped for a license. The issues of the stop was completely abandoned."

Petitioner testified that some of the main evidence at trial was text messages taken from a cell phone found in the car and that the content of the messages was included in the investigation report. He stated that the investigation report was dated October 5, 2016, that the search warrant for the cell phone was dated October 7, 2016, and that the search warrant was executed on October 14, 2016. Petitioner added that a text message not introduced at trial was time-stamped 8:42 p.m. on October 5, 2016, but that Deputy Gagnon had testified at trial that he had turned the phone off around 4:38 p.m. Petitioner stated that no motion was filed related to the discrepancies in the dates and times and that he discussed the discrepancies with all of his attorneys, including pretrial counsel and trial counsel. Petitioner stated that no motion was filed regarding "the illegal search of the phone," although he said that pretrial counsel filed a "motion to exclude text messages." Petitioner said that the discrepancies in the dates and times were not argued at the suppression hearing and that having included them would have led to the text messages' being suppressed.

Petitioner noted that this court "agreed with [him]" that some of the text messages should not have been introduced based upon the rule against hearsay.

Petitioner testified that he was not "given an inventory sheet of the search warrant, of any of the evidence or the money seized, nor of the reliable witness to the seizure of any of that." Petitioner stated that he discussed with all of his attorneys filing a motion "related to that" but that "there was never anything filed on" the search warrant. Petitioner opined that he would have been found not guilty at trial if the text messages had been suppressed.

Petitioner testified that, in spite of numerous requests to each of his attorneys, he did not receive a copy of the preliminary hearing transcript until after his conviction. He identified a February 10, 2017 letter from the Circuit Court Clerk's office, which acknowledged that the clerk had received three pro se motions from Petitioner in October and November 2016, including a "motion for transcript of the preliminary hearing." The clerk noted that the motions had been stricken by one of Petitioner's attorneys[3] at his arraignment in January 2017. Petitioner asserted that he wrote numerous letters to the court and his attorneys requesting the preliminary hearing transcript because he needed it for the suppression hearing; however, he never received the transcript. Petitioner noted that, on the morning of trial, he gave trial counsel a letter "from [pretrial counsel] that was [written] to the Board of Responsibility, because [Petitioner] filed a complaint for not getting the preliminary hearings against him after the suppression hearing." Petitioner stated that trial counsel presented the letter to the trial court but that he did not believe the trial court looked at it. Petitioner said that the trial court stated that transcripts from the preliminary and suppression hearings were being prepared for Petitioner. Petitioner said that he believed trial counsel did not have the preliminary hearing transcript on the morning of trial and that Petitioner asked for it in open court. Petitioner stated that he was "denied the right to postpone trial to get the transcripts that [he] needed for a fair trial." Petitioner eventually received the preliminary hearing transcript after sentencing counsel requested it for the motion for new trial.

The preliminary hearing, suppression hearing, and trial transcripts were received as exhibits. Petitioner testified that one of the inconsistencies in Deputy Gagnon's testimony was when he verified that Petitioner's driver's license was revoked. The preliminary hearing transcript reflected that Deputy Gagnon verified that Petitioner's driver's license was revoked "[a]fter the stop." The suppression hearing transcript reflected that Deputy Gagnon called another deputy to check Petitioner's driver's license before Petitioner rolled through the red light. The trial transcript reflected that, on cross-examination, Deputy Gagnon stated that the other deputy confirmed that Petitioner's license was revoked when Deputy Gagnon was "somewhere in between Dover Road and the time [Deputy Gagnon]

---

[3] The attorney representing Petitioner at that time was not pretrial or trial counsel.

observed [Petitioner] driving[.]" Petitioner did not think trial counsel cross-examined Deputy Gagnon about his inconsistent statements, although he could not "be positive if he did or not."

Petitioner stated that Deputy Gagnon's testimony at trial relative to where he initially saw Petitioner differed from his preliminary hearing testimony. The preliminary hearing transcript reflected that Deputy Gagnon first saw Petitioner "turning onto Highway 374 from Dover Road" and that he stopped Petitioner at "the 800 block of Lafayette Road" after Petitioner failed to stop completely at the intersection of Highway 374 and Lafayette Road. The trial transcript reflected that Deputy Gagnon saw Petitioner "in [the] vicinity" of Dover Road and Highway 374 when Petitioner was traveling east; Deputy Gagnon was traveling west on Dover Road when Petitioner passed him, "jumped onto 374[,] and started coming east[.]" Deputy Gagnon stated that he pulled in behind Petitioner and that, at the intersection of Highway 374 and Lafayette Road, Petitioner rolled through the red right. Deputy Gagnon testified that he activated his blue lights around the intersection of Lafayette Road and Glennon Drive and that Petitioner continued driving on Lafayette Road past "North Liberty Church Road" until he parked in a residential driveway near Northwest High School. The trial transcript reflects that an aerial map of the area was displayed on an overhead projector and that Deputy Gagnon indicated with a laser pointer where Petitioner stopped.

Petitioner testified that trial counsel did not utilize these "inconsistent" statements to cross-examine Deputy Gagnon. He stated, though, that trial counsel got Deputy Gagnon "to admit that he did not pull [Petitioner] over at [Glennon Drive], that he did pull [Petitioner] over at 842 Lafayette Road. That is where he activated his lights. He did not activate his lights at [Glennon Drive]." Petitioner also asserted that Deputy Gagnon testified that Petitioner "drove into the school after he hit his lights and sirens."[4] When asked whether it was "safe to say" that trial counsel could not use the preliminary hearing transcript in cross-examination because he did not have it, Petitioner stated, "I think the preliminary hearing transcript should've been introduced at trial, yes."

Petitioner testified that the investigation report was never introduced at trial, although he noted that trial counsel had Deputy Gagnon read paragraph two of the report to himself before Deputy Gagnon acknowledged that he pulled Petitioner over at 842 Lafayette Road. When asked whether the outcome of the trial would have been different if trial counsel possessed the preliminary hearing transcript, Petitioner responded affirmatively and stated, "I believe the proof would have shown inconsistency and perjury to the [c]ourt. I think [Deputy] Gagnon would have been impeached."

---

[4] The preliminary hearing and trial transcripts do not reflect any such statement.

Petitioner testified that pretrial counsel represented him at the suppression hearing. Petitioner stated that there were "numerous inconsistencies in the suppression hearing, in the [report] of investigation, preliminary hearing, compared to the trial[.]" He stated that he obtained the suppression hearing transcript after trial when he went to prison, and he noted that he asked for the transcript for more than one year before he received it. Petitioner agreed that trial counsel did not have a copy of the suppression hearing transcript at trial. He said, though, that trial counsel "may have" reviewed the transcript, but Petitioner never reviewed it. Petitioner agreed that trial counsel could not effectively cross-examine the witnesses related to inconsistent statements made during the suppression hearing.

Petitioner testified relative to pretrial counsel's representation at the suppression hearing that pretrial counsel "should've had the preliminary hearings for [him]." Petitioner asserted that pretrial counsel should have called as witnesses Ms. Brown and Mr. McCarty, Clarksville Police Department ("CPD") "Officer Hampton," and Montgomery County Sheriff's "Deputy Ayers."[5] When asked whether pretrial counsel argued an issue related to the length of the traffic stop, Petitioner responded that pretrial counsel "argued the stop" and "argued pretextual stop" but did not argue that Deputy Gagnon had not cited Petitioner for the traffic violations.

Petitioner acknowledged that this court's opinion on direct appeal noted that the record was unclear whether Petitioner raised the pre-stop delay prior to appeal and that the issue had therefore been waived. At this point, the State objected and said that "in regards to counsel for the suppression hearing, the argument is that he failed to raise appropriate objections. At this point we're getting into a different allegation entirely." The post-conviction court sustained the objection.

Petitioner testified that, prior to trial, he had the transcript of Mr. McCarty's guilty plea submission hearing but that Mr. McCarty was not "impeached with those transcripts" at Petitioner's trial. When asked whether trial counsel used the plea hearing transcript "to impeach Mr. McCarty," Petitioner stated, "To my knowledge, he was not impeached. But he could have been impeached later, I don't know about that. But at trial, no."

Mr. McCarty's plea submission hearing transcript was received as an exhibit and reflected that, when announcing the terms of the plea agreement, the State noted that the agreement was "that [Mr. McCarty] will testify, if called to at trial consistent with the statement that he's already given to law enforcement that the gun that was found with drugs was in the possession of [Petitioner]." Mr. McCarty interrupted and stated, "I mean, if they

---

[5] Officer Hampton's first name does not appear in the record. In addition, although "Ayers" is the spelling consistently used throughout the post-conviction proceedings, the investigation report refers to a Deputy Ryan Ayrest, and the suppression hearing transcript spells the name "Aoertz." These three spellings seemingly refer to the same person.

–" before his attorney instructed him not to say anything. The State presented the factual basis for the plea, including that Mr. McCarty had told the police that the gun belonged to Petitioner. When asked whether he understood the contents of the plea form, Mr. McCarty indicated that he did not understand "fully," and the trial court paused the proceedings for Mr. McCarty to confer with his attorney. After Mr. McCarty affirmed that he now understood the plea form, the trial court reviewed Mr. McCarty's rights with him and accepted the guilty plea. The trial court asked Mr. McCarty if he understood that his probation could be revoked if he "fail[ed] to provide truthful testimony," and the State requested that Mr. McCarty state on the record what his testimony would be regarding the gun. The following exchange occurred:

> MR. McCARTY: The gun wasn't mine. I mean, the gun wasn't mine to -- it was Lynn Austin's. He knows that. I mean –
>
> THE COURT: Well, who did the gun belong to?
>
> MR. McCARTY: I mean, it wasn't mine; I don't know who it actually belonged to, but I know it was his car, his gun, his . . . I mean, I was just in the back seat, passenger, riding. And, I mean, the dope was found up front but now it's in the back seat; I don't understand. It's — it's his. I'm just — I know it wasn't mine. I can't really say it was his, because I never — I never was around him in the first place to have the gun or nothing like that. But, I mean, it was underneath his seat. I mean, his fingerprints are all over this gun.
>
> [THE STATE]: Mr. McCarty, when you were arrested you told the officers that you knew the gun was in the car.
>
> MR. McCARTY: But I— but I didn't tell them that I knew the gun— that I— it wasn't in there.
>
> [THE STATE]: Let me ask you: You told them you knew the gun was in the car.
>
> MR. McCARTY: Yes, sir.
>
> [THE STATE]: How did you know the gun was in the car.
> MR. McCARTY: Because Lacy Austin.
>
> [THE STATE]: Because Lacy Austin told you the gun was in the car?

- 23 -

MR. McCARTY: Yeah.

[THE STATE]: All right. That he had a gun in the car?

MR. McCARTY: Yes, sir.

Petitioner asserted that the paper upon which Ms. Brown and Mr. McCarty wrote their personal information "never existed because nobody ever wrote anything down at the scene." He stated that he discussed this with "every attorney," that a motion was never filed related to it, and that "that piece of paper is what kicked off the whole investigation—or [Deputy] Gagnon . . . pulling the passengers out of the car—but that is not what happened." Petitioner stated that the outcome of the trial would have been different if a motion had been filed regarding the fictitious piece of paper, and he repeated that the paper was Deputy Gagnon's stated reason for having the passengers exit the car.

Petitioner noted that trial counsel asked Deputy Gagnon if Petitioner had signed a consent to search but that "the piece of paper was never brought up." Petitioner stated,

> [H]e did not go to the car because he expected that they were lying to him because they never wrote anything on a piece of paper. That piece of paper never existed. He went to the passenger door to get the passengers out because I signed the consent to search form in front of Officer Hampton, Clarksville Police Department. I signed it by show of force, and [Deputy] Gagnon told me he don't want to search anyway.

Petitioner testified that he discussed "all of these issues" with appellate counsel and that he did not believe appellate counsel presented all of the relevant issues on appeal. When asked what issues he believed should have been raised, the following exchange occurred:

A. What wasn't raised? There is numerous issues that weren't raised.

Q. Well, is it most of the stuff that we have already covered?

A. Most of what?

Q. Is it pretty much the stuff that we have already covered –

A. Pretty much, yes.

Q. -- that wasn't raised?

- 24 -

A. The warrants were. The illegal search of the phone was not brung up, but the text messages were brung up. And the Appeal Court did rule in my favor on the text messages. However, the illegal search was not included in the appeal.

Q. Right . . . [W]as it brought up in the appeal the statements that you made about helping Agent Gagnon make a drug case, or make a big drug case?

A. Did I what?

Q. Were the issues related to you making statements to Agent Gagnon that you could help make a drug case, help him make a big drug case, were those presented at the appellate level?

A. Not to my knowledge.

Q. Okay. Any of the issues related to the transcript, were those brought up at the appellate level?

A. No. I saw in the appeal it says, it only mentions the preliminary hearing transcripts I did not get. I did not get the special hearing either. That was not brung up in the appeal.

Petitioner stated that he had written down twenty-one pages of "numerous lies" and "inconsistencies" from the investigation report, the preliminary hearing, the suppression hearing, and trial. Petitioner identified a "CAD call log," which he averred undermined Deputy Gagnon's testimony that "they had to verify back everything that he said before he pulled [Petitioner] over, and that's the reason he pulled [Petitioner] over at 842 Lafayette Road and not Gl[ennon]. There's nothing in this report that shows . . . they had to report back to him" before he pulled over Petitioner. Petitioner noted that the report also showed that CPD officers and "Officer Hampton" were on scene for fifty-three minutes, although Deputy Gagnon testified that a CPD officer was on the scene for six to eight minutes, "which made it so he could have referred to another officer." Petitioner stated, though, that "nothing in the whole entire investigation . . . shows that Officer Hampton was on the scene for 53 minutes."

The CAD report was received as an exhibit and reflected that Deputy Gagnon was "Dispatched" and "At Scene" at 4:38:40 p.m. on October 5, 2016. Officer Hampton was noted to have been dispatched and at the scene at 4:39:58 p.m., although there were also

- 25 -

entries time-stamped 4:39:59 p.m. reading "Enroute to Scene" and at 4:43:08 p.m. reading "At Scene." Officer Hampton was noted as "Available" at 5:32:23 p.m.

Petitioner testified that Officer Hampton witnessed "the whole entire investigation" but that this was never raised in pretrial motions or after trial. Petitioner stated that he believed the outcome of his trial would have been different if Officer Hampton's presence had been "brought up" because "Officer Hampton should have been called as a witness from the very beginning, and [Petitioner] should have got a report of investigation from the [CPD], which [he] never got." Petitioner noted that he requested the CPD report and dashcam recording numerous times, including in his pro se motion for discovery, and that he asked all of his attorneys to "subpoena his entire shift for his dash[]cam. Not just the stop, but his entire shift. That was never done."

On cross-examination, Petitioner testified that trial counsel "never discussed the defense that he was going to do with [him] at all." Petitioner noted that trial counsel "never gave [him] what his input on the trial would be, and he done absolutely opposite of what [Petitioner] wanted him to do, what [he] discussed with him to do." Petitioner averred that trial counsel did not present the "evidence available."

Relative to the preliminary hearing transcript, Petitioner repeated that he did not know if trial counsel reviewed it but that he did not think trial counsel did so. Petitioner clarified that his issue was that he was unable to review the transcript, and "the inconsistencies and the perjuries that was in there was never brought up at trial."

Petitioner testified that, although trial counsel cross-examined Deputy Gagnon "on numerous things," he did not "cross-examine on some of the things that he should have." When asked to specify, Petitioner stated, "I don't know specifics, but I have 21 pages that I can present to the [c]ourt as perjury."[6] Petitioner stated that, if trial counsel had questioned Deputy Gagnon using the investigation report, the preliminary hearing transcript, and the suppression hearing transcript, "it could have proved impeachment" and the outcome at trial would have been different.

Petitioner acknowledged that trial counsel began Deputy Gagnon's cross-examination by asking about "the issue of when [Deputy] Gagnon testified that [Petitioner] kept going . . . . He did cross-examine him on seeing [Petitioner] on Dover Road and following [him] for three miles before pulling [Petitioner] over."

---

[6] The twenty-one pages to which Petitioner referred were not exhibited to the post-conviction hearing.

When asked how trial counsel failed to adequately prepare for trial, Petitioner repeated that trial counsel did not cross-examine the witnesses "compared to the preliminary hearing, report of investigation, suppression hearing. He did not give [Petitioner] what [he] needed, and he did not file the motions needed. And he did not argue the illegal search of the phone." When asked what motions trial counsel should have filed, Petitioner stated that counsel did not seek "for the search warrant to be suppressed" and that he did not "file the motion for the piece of paper . . . that . . . the codefendants wrote their names on. It does not exist."

When asked whether he believed the paper was "so integral" to the case that it could have changed the outcome of the trial, Petitioner stated, "I don't believe it would have changed the whole outcome, but I believe it would have contributed to . . . the outcome . . . . That piece of paper is what kicked off the whole investigation, so that is a major piece of evidence in the trial."

Petitioner testified that trial counsel should have called Officer Hampton and Deputy Ayers as witnesses; he noted that, at the end of trial, he asked trial counsel to call Officer Hampton and that trial counsel told him to "be quiet." Relative to trial counsel's investigation, Petitioner stated that he should have provided him with the investigation report, preliminary hearing transcript, and suppression hearing transcript, and that he should have subpoenaed Officer Hampton's "whole body and dash[]cam for the whole shift[.]"

When asked how trial counsel failed to investigate the police and witness statements, Petitioner stated that trial counsel did not bring up Mr. McCarty's statements at his guilty plea hearing or "anything in the report of investigation." Petitioner noted that Deputy Gagnon should have been questioned about the disparity between the investigation report, in which Deputy Gagnon stated that Ms. Brown and Mr. McCarty told him that the methamphetamine and gun belonged to Petitioner, and Ms. Brown's and Mr. McCarty's trial testimony, in which they both stated that they did not know the methamphetamine was in the car, and Mr. McCarty testified that he did not know to whom the gun belonged.

Petitioner testified that trial counsel met with him two or three times, although he was "not positive of that." He said that trial counsel listened to him but that trial counsel did not explain to Petitioner his rights or what counsel was going to do in the case. Relative to trial counsel's developing a trial strategy, Petitioner stated that trial counsel "did not get the evidence that [they] needed."

Petitioner testified that trial counsel never objected to Deputy Gagnon's testimony that Petitioner admitted a gun was in the car and that Petitioner "tried to make a [f]ederal drug case at the magistrate's window." Petitioner noted that he requested recordings from

the magistrate's window and the Drug Task Force and that he never received them. Petitioner said that trial counsel also never brought up that Petitioner had invoked his right to an attorney but was held and questioned for "five or six hours." Petitioner stated that he discussed potential suppression issues with trial counsel during a jail visit.

Relative to pretrial counsel's representation at the suppression hearing, Petitioner testified that pretrial counsel "should have objected to numerous things." Petitioner stated that he would need to refer to his twenty-one-page packet of notes to give a more specific answer. Petitioner agreed that "there are multiple issues [pretrial counsel] should have objected to that [Petitioner had] previously filed with the [c]ourt." Petitioner stated that he and pretrial counsel had a conversation at the jail about what would happen at the suppression hearing but that the telephone cut off, preventing a "full conversation." Petitioner noted that he "never agreed fully to have this suppression hearing" and that the hearing was continued because Petitioner and pretrial counsel "ha[d] issues" and Petitioner wanted to review the preliminary hearing transcript. Petitioner agreed that he and pretrial counsel discussed his case and what Petitioner believed the arguments at the suppression hearing should be. Petitioner said that he met with pretrial counsel once before the suppression hearing; he later clarified that pretrial counsel visited him at the jail once and a second time "in the courtroom on the phone in the holding cell."

Petitioner testified that he requested numerous things from pretrial counsel, including "the preliminary hearing [transcript] and the codefendants to be called as witnesses and a report of investigation," which he never received. Petitioner noted that the suppression hearing went forward without them and that he filed a complaint against pretrial counsel. Petitioner averred that he asked trial counsel if he could "get a new suppression hearing."

When asked what specific objections pretrial counsel should have raised at the suppression hearing and what issues of law appellate counsel failed to address in the direct appeal, Petitioner stated that they were issues "you need to discuss with my attorney[.]" Petitioner said that appellate counsel "failed to raise issues" and that he had them written down. Petitioner explained that he had previously been shot in the head and that the traumatic brain injury affected his memory.

After Petitioner closed his proof, the State called trial counsel as a witness. Trial counsel testified that he was appointed to Petitioner's case in January 2018, and that the case was set for trial in March 2018. Trial counsel stated that he told Petitioner that they could file a motion to continue the trial due to counsel's recent appointment, but that Petitioner was "adamant that he wanted it heard in March." Trial counsel stated that his file notes reflected that he met with Petitioner five times, although there may have been

additional meetings he failed to notate. Trial counsel said that he discussed with Petitioner his trial strategy and what was going to happen in the case.

Trial counsel noted that Petitioner's previous attorneys had "already done a lot of the heavy lifting on the case," including having a suppression hearing, and that the case was "pretty much trial ready" when he began work on it. Trial counsel opined that he had sufficient time to "get caught up and review everything" and that he was prepared for trial. Trial counsel received the discovery materials from pretrial counsel and visited Petitioner in jail to ensure that they both had the same documents. Trial counsel did not remember Petitioner's mentioning that anything was missing on that occasion.

Trial counsel testified that he did not always obtain transcripts of preliminary hearings. He stated that, in this case, he listened to the recording of the preliminary hearing and decided not to request a transcript because all of Deputy Gagnon's testimony was corroborated by the discovery materials. Trial counsel explained that the only reason he would have needed to obtain the transcript was for impeachment purposes and that he could impeach Deputy Gagnon using the discovery materials he already had. Trial counsel agreed that Petitioner asked him for a copy of the transcript; he noted that he generally provided a copy of transcripts to defendants if he had them made, but he said that he did not believe obtaining the transcript was necessary in Petitioner's case.

Trial counsel testified that he and Petitioner discussed Deputy Gagnon's following Petitioner for a distance and initiating the traffic stop close to Northwest High School. Trial counsel stated that, although they had discussed whether Deputy Gagnon's actions were "any kind of entrapment," he later concluded that they had no legal basis to raise an entrapment defense. Trial counsel noted that case law indicated that "just traveling through a school zone is still a violation" and that Petitioner "was going through that school zone on his own."

Relative to Petitioner's complaint that trial counsel should have "suppressed the search warrant," trial counsel testified that he did not remember why he did not seek suppression, but "[t]here had to have been some kind of legal reason [he] didn't[.]" He noted that, if the issue had been included in the post-conviction petition, he would have reviewed his file to verify the reason.

Trial counsel testified relative to Petitioner's request for Deputy Gagnon's dashboard camera recording that he contacted the prosecutor and the sheriff's office and was informed that Deputy Gagnon did not have a camera. Trial counsel stated that Officer Hampton was not at the trial and that counsel did not remember why they would have needed him to testify; he noted that Petitioner had not included an issue in the post-conviction petition related to Officer Hampton and Deputy Ayers. He stated that the

officers would not have been on his witness list because they would not discredit the State's case.

Trial counsel had no memory of discussing with Petitioner a motion related to the paper upon which Ms. Brown and Mr. McCarty wrote their identifying information. Trial counsel stated that all the evidence he had was in the discovery materials and that he was unsure to what Petitioner referred when he stated that trial counsel did not obtain needed evidence. Trial counsel opined that he had all the evidence he needed to defend Petitioner and that nothing appeared to be missing. Trial counsel stated that he obtained the transcript of Mr. McCarty's plea hearing and that he reviewed it prior to trial; he did not remember there being inconsistencies in Mr. McCarty's trial testimony that would have necessitated counsel's using the transcript. Trial counsel noted that the biggest issue in his cross-examination of Mr. McCarty was the fact that his plea agreement was contingent upon his testimony against Petitioner.

Relative to objections at trial, trial counsel testified that he made objections when he believed they had a legal basis and that he did not remember any incidents when he should have objected but did not. Trial counsel "very vaguely" remembered Deputy Gagnon's testimony about Petitioner's statement at the magistrate's window about helping him make a federal case, but he did not recall whether the statement was made "pre-*Miranda* [or] post-*Miranda*" warnings. Trial counsel stated that the text messages were admitted after a pretrial motion in limine and that, at trial, counsel renewed his objection to the messages and the cell phone in an effort to exclude them from evidence.

On cross-examination, trial counsel testified that he did not recall considering filing any additional pretrial motions; he noted that pretrial counsel had a motion in limine set for hearing when trial counsel's representation began. Trial counsel denied filing any motions related to Petitioner's statements. Trial counsel did not remember Petitioner's ever mentioning the statement he made to Deputy Gagnon about helping him with a federal case. Trial counsel did not recall Petitioner's asking him to file additional motions, and he noted that, "if what he want[ed] doesn't match the law," trial counsel could not argue it.

Trial counsel testified that he looked for inconsistencies in the discovery materials; although he did not remember exactly which inconsistencies he used at trial, he noted Petitioner's post-conviction testimony that he cross-examined Deputy Gagnon on some inconsistent statements. Trial counsel stated that he was unsure of which inconsistent statements Petitioner alleged he failed to utilize in Deputy Gagnon's cross-examination. Trial counsel said that he may have discussed the case with Deputy Gagnon in passing when they saw each other at the courthouse. He did not recall speaking with Officer Hampton or Petitioner's discussing Officer Hampton with him.

- 30 -

Trial counsel did not remember discussing with Petitioner the dates on the search warrant and investigation report, although he was "sure" he did so. Trial counsel did not recall how many times he impeached Deputy Gagnon with the investigation report. Trial counsel did not remember objecting to Petitioner's statements at the magistrate's window and about the gun being in the car or "mentions of the search warrant[.]" He stated that his only objection to the text messages was based upon hearsay and that he did not argue that they were illegally obtained.

Appellate counsel testified that he was appointed to Petitioner's case after the motion for new trial. Appellate counsel identified a printout from a "computerized system" he used at that time to track his work. The printout was received as an exhibit and reflected that, between May 7, 2019, and January 4, 2021, appellate counsel spent 14.10 billable hours on Petitioner's case. Appellate counsel stated that he reviewed the file, read any necessary paperwork, met with Petitioner, and spoke to "anybody else involved with it[.]"

Appellate counsel testified that some issues for appeal were laid out in the motion for new trial, like the sufficiency of the evidence, "suppression of certain statements and some physical evidence," and witness credibility, all of which he included in the appellate brief. Appellate counsel stated that, to his knowledge, no additional issues existed that should have been raised.

On cross-examination, appellate counsel stated that his review would not have necessarily included the discovery materials, and his only independent recollection was of reviewing the trial and hearing transcripts. Appellate counsel's notes indicated that he met Petitioner in person once and spoke with Petitioner's daughter on the telephone.

Appellate counsel did not recall raising any issues related to the search warrant, the dates on the search warrant and investigation report, Petitioner's statement that he could help the police with a federal drug case, or Petitioner's not having been provided with the preliminary hearing transcript. He noted that his independent recollection of the case was poor. Upon reviewing the direct appeal opinion, appellate counsel stated that "if there was a record saying there had been a failure to raise that issue, [he] must not have been aware of it or [he] must have failed to raise that."

At the conclusion of proof, post-conviction counsel argued that Petitioner had "pointed out many deficiencies in the representation" including (1) trial counsel's not obtaining the preliminary hearing transcript; (2) inadequately impeaching Deputy Gagnon and not using the affidavit of complaint and investigation report; (3) "an issue with the search warrant that was never dealt with"; and (4) "an issue with *Miranda*, with some statements that was never dealt with." Post-conviction counsel argued that appellate counsel "essentially admitted that there were some issues that he failed to raise based on

what was in the appellate decision . . . [He] also did admit that might have been brought to his attention and he still failed to present them in the Appellate Court."

When asked to specify what issue existed with the search warrant, post-conviction counsel stated that, based upon the dates listed in the October 7 search warrant and October 5 investigation report, "it appears that the phone might have been searched before the search warrant was listed."

The post-conviction court noted that the search warrant was dated October 7 and that the "investigati[on] report specifically makes reference that October 7, 2016, [he] wrote two separate search warrants for cellular phones." Post-conviction counsel stated that "the date that the investigati[on] report was created was October 5" and that the investigation report "makes reference to those text messages that shouldn't have been searched until later." The post-conviction court reiterated that "the investigati[on] report itself states that on October 7, [he] wrote two separate search warrants." The State argued that the post-conviction petition had not raised the issue of the search warrant and that the hearing was the first time the State learned of the allegation.

The post-conviction court filed a written order denying relief. Relative to the preliminary hearing transcript, the post-conviction court found that trial counsel had listened to the hearing recording and compared it to the discovery materials and that he determined that obtaining the written transcript was unnecessary. The court also found that Petitioner offered no proof of how having the transcript would have changed the outcome of his trial.

Relative to trial counsel's preparation for trial, investigation, and communication, the post-conviction court found that Petitioner offered no proof that trial counsel was unprepared for trial or failed to investigate. The court noted that Petitioner had not called any witnesses or made offers of proof containing information trial counsel should have uncovered. The court concluded that trial counsel was not deficient and that Petitioner was not prejudiced.

Relative to the suppression hearing, the post-conviction court found that Petitioner had not presented any "significant" issues or objections regarding the traffic stop that were not raised and that would have changed the outcome.

Relative to Petitioner's claim that trial counsel failed to make objections, the post-conviction court found that Petitioner presented no proof of specific objections trial counsel should have made or that he was prejudiced.

Relative to appellate counsel's performance, the post-conviction court found that Petitioner had offered no proof related to issues of law that would have resulted in a different outcome had they been raised by appellate counsel on direct appeal. The post-conviction court concluded that "the allegations in the pro se Petition . . . [were] not supported by any evidence" and that this issue was without merit.

After the post-conviction court denied relief, Petitioner timely appealed.

*Analysis*

On appeal, Petitioner contends that trial counsel was deficient for failing to (1) properly investigate and prepare for trial by failing to obtain "copies of transcripts of the previous hearings in this matter," which resulted in deficient cross-examination of Detective Gagnon; (2) raise "pertinent issues related to the search warrant and [Petitioner's] *Miranda* rights before and at trial"; and (3) raise "certain issues" before or during trial "which waived the ability to appeal the issue during the appeal, including any issues regarding pre-stop delay." Petitioner also argues, without elaboration, that he received ineffective assistance of appellate counsel because counsel "failed to raise all pertinent issues in the direct appeal."[7] Finally, Petitioner broadly asserts that, "[w]hile each issue individually may not seem to rise to the level of ineffective assistance on its own, when each is totaled together, it rises to the level of ineffective assistance of counsel[.]"

Petitioner's argument regarding prejudice is set out separately from his section on deficiency and only addressees trial counsel's performance; as the State notes, some of the alleged prejudicial effects are not connected to discrete instances of alleged deficiency. Petitioner argues that the outcome of his trial would have been different for the following reasons:

> The jury did not hear about the lies told by [Mr.] McCarty concerning who the firearm belonged to. The jury did not hear about the discrepancies between the dates on the investigati[on] report and the date the search warrant was executed, nor was a motion to suppress ever filed related to this issue.

---

[7] As the State notes, Petitioner included nine grounds of ineffective assistance in the section of his brief entitled, "Introduction." However, Petitioner merely recited the issues set forth in the amended post-conviction petition, and several of these issues are never addressed in the argument section of his brief. As a result, we believe this portion of the introduction is more accurately characterized as part of the statement of the case. To the extent that Petitioner may have attempted to raise all nine grounds of ineffective assistance, he has waived our consideration by inadequately briefing them. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). We will confine our review to the issues discussed in the argument section of Petitioner's brief.

Had [t]rial [c]ounsel filed a motion to suppress the evidence found via the search warrant, i.e., the text messages, the jury would not have been able to rely on those messages to convict [Petitioner] of these crimes, and could have changed the outcome of the trial.

Furthermore, [Petitioner] was prejudiced by no attorney filing a motion related to the original complaint or cross-examining Deputy Gagnon related to his reasons for stopping [Petitioner]. Deputy Gagnon maintained that the reason for the stop of [Petitioner] was due to [Petitioner's] driving with a revoked license. [Petitioner] was not initially charged with driving with a revoked license. This clearly shows that Deputy Gagnon was lying about the reasons for the stop. This was never presented to the jury and had it been the jury could have decided differently based on the credibility of Deputy Gagnon.

The State responds that trial and appellate counsel provided effective assistance and that Petitioner has waived his cumulative error claim for failure to raise it in the post-conviction court.

To prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## I.    *Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the

deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, this court "need not address both elements if the petitioner fails to demonstrate either one of them." *Kendrick*, 454 S.W.3d at 457. Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006). We apply the same *Strickland* test used to assess the effectiveness of trial counsel to assess the effectiveness of appellate counsel. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

*1. Hearing transcripts/cross-examination of Deputy Gagnon*

Petitioner contends that, by failing to cross-examine Deputy Gagnon using the physical copy of the preliminary hearing[8] transcript, the jury did not hear that Petitioner was not charged with any of the violations leading to the traffic stop. Petitioner states that

---

[8] We note that Petitioner's initial argument addresses "the previous hearings in this matter," plural. However, the substance of Petitioner's argument only addresses the preliminary hearing and does not discuss the suppression hearing or other pretrial hearings; we will confine our review accordingly.

the lack of traffic charges "clearly shows that Deputy Gagnon was lying about the reasons for the stop," which could have led the jury to decide the case differently based upon Deputy Gagnon's credibility.

The post-conviction court found that trial counsel was not deficient, noting trial counsel's testimony that he listened to the preliminary hearing recording and that Deputy Gagnon's testimony at the hearing was fully corroborated by the discovery materials. Trial counsel opined that, in light of the other corroborating evidence he already had, obtaining the paper transcript was unnecessary.

Our review of the trial transcript reflects that, on cross-examination, trial counsel elicited from Deputy Gagnon that Petitioner was not charged with any traffic offenses. When asked why he did not cite Petitioner for the offenses that were "the basis for the stop," Deputy Gagnon replied, "I . . . don't have to cite him for it. It's just a big probable cause." Petitioner's argument on appeal ignores that the jury did, in fact, hear that he was not ultimately charged with the traffic offenses and still convicted him. The record supports the post-conviction court's determination that trial counsel was not deficient in this regard. Petitioner is not entitled to relief on this basis.

### 2. *Other cross-examination issues/other motions*

Petitioner also argues that trial counsel's cross-examination of Deputy Gagnon was deficient for failure to use the affidavit of complaint[9] and the investigation report— specifically,[10] the discrepancy in the date the investigation report was prepared and the date on which the search warrant was executed—to discredit Deputy Gagnon.

Because Deputy Gagnon did not testify at the post-conviction hearing, we cannot speculate as to how he may have explained the conflicting dates included in the investigation report and what effect it might have had on Petitioner's trial. When a petitioner asserts that trial counsel should have called witnesses or, as here, should have conducted cross-examination differently, the person in question should be called as a witness to the post-conviction hearing in order to establish what different testimony would

---

[9] Petitioner's argument does not address what portion of the affidavit of complaint trial counsel should have used but rather focuses on the investigation report and the search warrant. Our review of the affidavit indicates that Petitioner is likely referring to the report's only including the failure to stop at a red light before turning as the impetus for the traffic stop.

[10] Petitioner generally asserts that trial counsel should have brought "inconsistencies" between Detective Gagnon's trial and preliminary hearing testimony to the jury's attention before discussing the dates in the investigation report and the search warrant. We will confine our review to the specific ground Petitioner argues, i.e., the alleged discrepancy in the search warrant and investigation report dates.

have been elicited. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of . . . what a witness's testimony might have been if introduced by defense counsel"). We note that the record supports the post-conviction court's observation at the post-conviction hearing that, although the investigation report states that it was composed on October 5, it also states that the search warrant was obtained on October 7—it does not necessarily support Petitioner's claim that the search warrant was obtained after the cell phone was already searched. Petitioner is not entitled to relief on this basis.

Relatedly, Petitioner avers that trial counsel should have filed a "motion related to the original complaint," impliedly on the topic of the inconsistent dates. Because Petitioner provides no legal basis for such a motion, citation to authority, or further argument about why such a motion would have succeeded and changed the outcome of his trial, he has inadequately briefed the issue and waived our review. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

Petitioner further asserts that, "had trial counsel presented all the evidence [Petitioner] requested, then the outcome of the trial would have likely been different." However, his argument does not include what additional evidence trial counsel should have obtained, and his brief is also inadequate in this regard. *See* Tenn. R. Ct. Crim. App. 10(b).

Petitioner also argues that "certain issues . . . were not brought up before trial or objected to at trial, . . . including any issues regarding pre-stop delay. Because this issue was not brought up pre-appeal by [t]rial [c]ounsel or other attorneys who represented [Petitioner] pre-trial, the issue was not able to be considered by this [c]ourt." Petitioner has waived consideration of this issue because it is inadequately briefed; he has not set out the legal basis for such an objection or provided any relevant authority or references to facts in the record regarding the pre-stop delay. *See* Tenn. R. Ct. Crim. App. 10(b). Moreover, the post-conviction court did not address pre-stop delay because it was not raised in the post-conviction petition, as amended, or clearly raised as a freestanding issue during the post-conviction hearing. *See Holland v. State*, 610 S.W.3d 450, 459 (Tenn. 2020) (stating that this court is without authority to consider issues not addressed by the post-conviction court). We note that, to the extent that Petitioner attempts to raise an ineffective assistance issue related to "other attorneys who represented [Petitioner] pre-trial," it has also been waived. The post-conviction petition, as amended, did not raise the effectiveness of attorneys other than trial and appellate counsel, and the post-conviction court's order only discussed trial and appellate counsel.

Finally, Petitioner states in his discussion of prejudice that the jury "did not hear about the lies told by . . . [Mr.] McCarty, concerning who the firearm belonged to."

Although the transcript of Mr. McCarty's plea submission hearing was introduced as an exhibit to trial counsel's testimony, Petitioner did not address Mr. McCarty's plea hearing in the post-conviction petition, as amended, the post-conviction court did not discuss it in its order, and Petitioner does not address it in his brief. To the degree that Petitioner has attempted to raise an issue related to trial counsel's failure to obtain or utilize the plea hearing transcript to cross-examine Mr. McCarty, it has been waived because it was inadequately briefed and not addressed by the post-conviction court. *See* Tenn. R. Ct. Crim. App. 10(b); *Holland*, 610 S.W.3d at 459.

### 3. Motions to suppress

Petitioner argues that trial counsel failed "to raise pertinent issues related to the search warrant and [Petitioner's] *Miranda* rights" and that, "[h]ad these issues been raised prior to trial, certain evidence might have been excluded prior to trial." Petitioner avers that, "[i]f these issues had been raise[d] at trial before the jury, the jury could have made different findings based on these issues. These are serious constitutional violations that [Petitioner] was faced with due to the inadequate representation of [t]rial [c]ounsel and each attorney [Petitioner] had prior to trial." We note that the prejudice section of Petitioner's brief does not address the *Miranda* issue. Petitioner also notes in his discussion of the dates in the investigation report and the search warrant that no motion to suppress was filed on the issue.

In *Phillips v. State*, our supreme court articulated the following:

> [T]o establish a successful claim of ineffective assistance of counsel based on counsel's failure to file a motion to suppress evidence on Fourth Amendment grounds, the Petitioner must prove: "(1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence."

647 S.W.3d 389, 404 (Tenn. 2022) (citations omitted). The *Phillips* court cautioned that "[i]t remains the petitioner's burden to prove the factual allegations supporting all claims in the petition by clear and convincing evidence." *Id.* (citing Tenn. Code Ann. § 40-30-110(f)). This court has applied the procedure prescribed in *Phillips* to ineffective assistance claims based upon the failure to file a motion to suppress on Fifth Amendment grounds. *See, e.g.*, *Ramey v. State*, No. E2023-00724-CCA-R3-PC, 2024 WL 2078568, at *6 (Tenn. Crim. App. May 9, 2024) (applying *Phillips* to a motion to suppress the victim's identification of the petitioner), *perm. app. denied* (Tenn. Sept. 12, 2024); *Simpson v. State*, No. W2021-00849-CCA-R3-PC, 2022 WL 2966281, at *10 (Tenn. Crim. App. July

27, 2022) (applying *Phillips* to a motion to suppress the petitioner's statement to detectives), *perm. app. denied* (Tenn. Dec. 19, 2022).

In this case, Petitioner's burden was to prove by clear and convincing evidence that a constitutional violation occurred and a motion to suppress would have succeeded, that the failure to file the motion to suppress based upon the violation—by previous counsel, pretrial counsel, or trial counsel—was objectively unreasonable, and that, but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence. The post-conviction court found that Petitioner had failed to establish that any substantial issue involving the traffic stop was not raised at the suppression hearing.[11]

### A. Investigation report and search warrant dates

With the exception of noting that no motion to suppress was filed relative to the dates on the investigation report and the search warrant, Petitioner's argument in his brief only states that the jury never learned of the discrepancy. Petitioner's brief is insufficient because it does not set forth applicable authority on suppression of search warrants, make an argument to support his assertion that the discrepancy in the dates would have entitled him to suppression of the cell phone evidence, or reference facts in the record to support his argument; as such, he has waived consideration of this issue. *See* Tenn. R. Ct. Crim. App. 10(b). We note again that the record supports the post-conviction court's observation that the investigation report does not establish that the search warrant was obtained after the cell phone was already searched. Petitioner is not entitled to relief on this basis.

### B. *Miranda* violation

Petitioner's brief does not specify when he allegedly invoked his right to counsel or set out how law enforcement infringed on that right, identify the "certain evidence" that would have been suppressed had his *Miranda* issue been raised, set out the applicable authorities governing suppression of a defendant's statement to police made after invoking the right to counsel, or explain how the suppression of this "certain evidence" would have changed the outcome of Petitioner's trial in light of the other evidence of his guilt. Petitioner's brief is inadequate because it is unsupported by argument, citations to authority, and references to facts in the record, and he has waived consideration of this issue. *See* Tenn. R. Ct. Crim. App. 10(b). Similarly, Petitioner makes no substantive argument to support the assertion that the jury would not have convicted him if trial counsel

---

[11] As we discussed above, pretrial and previous counsel were not included in the post-conviction petition, as amended, and the post-conviction court did not discuss attorneys other than trial and appellate counsel in its order. To the extent that Petitioner attempts to raise the effectiveness of pretrial or previous counsel, he has waived the issue. *Holland*, 610 S.W.3d at 459.

- 39 -

had raised a *Miranda* issue during trial, including the legal basis upon which trial counsel should have objected. Petitioner is not entitled to relief on this basis.

## II.    *Cumulative Error*

Petitioner did not include a cumulative error issue in his post-conviction petition, and the post-conviction court did not consider it. *See Holland*, 610 S.W.3d at 459. In addition, Petitioner's brief is inadequate because he has not set out the relevant authority on cumulative error. *See* Tenn. R. Ct. Crim. App. 10(b). Petitioner's cumulative error issue has been waived for failure to raise it in the court below and adequately brief the issue on appeal.

## *Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE